SORBER *v.* STATE

No. 39358 December 6, 1954 76 So. 2d 234

*R. M. Allen,* Indianola, for appellant.

*Joe T. Patterson, Asst. Atty. Gen.,* Jackson, for appellee.

McGEHEE, C. J.

At the September 1953 Term of the Circuit Court of Sunflower County the appellant, Minor Sorber, was jointly indicted with William A. Wetzel, Robert "Ohio" Jones and Robert Harrison for the murder of Edgar G. "Sonny" McGraw on April 14, 1953, on a turnrow near the edge of a cornfield on the penal farm of the Mississippi State Penitentiary in Sunflower County. The appellant was tried separately. He was tried on the 24th and 25th days of September, 1953, the trial beginning on the next morning after William A. Wetzel's trial had been completed and he had been sentenced to death. There was a motion for a continuance of the appellant's case, and in the alternative for a change of venue, on the ground that the newspaper articles concerning the Wetzel trial and the charges against his co-defendants which had appeared in the Commercial Appeal at Memphis, the Delta Democrat-Times at Greenville, the Jackson Daily News and the Indianola Enterprise, the latter being a local newspaper and all of them having a general circulation in Sunflower County, had served to cause a prejudgment on the part of the prospective jurors as to the appellant's guilt or innocence and to prejudice his right to a fair and impartial trial. The motion for the continuance or for a change of venue was

overruled, and this action of the trial court is assigned as a ground of error on this appeal.

The other grounds assigned as error are first that the verdict of guilt which resulted in the defendant Sorber being sentenced to death, was against the overwhelming weight of the evidence; second, that the court erred in not sustaining his motion for a new trial; third, that the trial court erred in admitting certain incompetent and highly prejudicial evidence upon the trial of the case; and fourth, that the said defendant was deprived of his constitutional right to a fair and impartial trial during the course thereof.

It appears from the proof that Edgar G. ''Sonny'' McGraw, the victim of the knife slaying on the penal farm, had entered a plea of guilty to a charge of felony in Pike County, Mississippi, and had disclosed to the prosecuting officers the guilt of his two accomplices in the crime—McKnight and Watson; that he was given a sentence of two years in the state penitentiary and his accomplices were given much longer terms when they entered pleas of guilty upon learning that McGraw had agreed to ''turn state's evidence'' against them. It was the theory of the prosecution in the instant case that Sorber and the men jointly indicted with him had conspired to kill McGraw for violating the code of the underworld in admitting his own guilt of crime and then telling on his accomplices; that although neither of the four men indicted in the instant case for the murder of McGraw had been implicated by McGraw as being involved in the crime which he committed in Pike County, Mississippi, or elsewhere, they were nevertheless willing to put him to death for having told on other criminals, whom they had known only a few days.

The proof further disclosed that the said Edgar G. ''Sonny'' McGraw arrived at Parchman where the state penal farm is located on Sunday or Monday afternoon, was assigned along with the said McKnight to Camp

5; that they went to the cornfield on the next morning with approximately 70 other convicts to plant peas or soybeans among the stalks of corn, which were from 5 to 7 inches high, and that two men were assigned to each row, one to dig the holes and the other to drop the seed therein and cover the same; that McGraw was murdered in the early afternoon of his first day in the field; that sometime during the forenoon, either before or after the men had gone to the field, the driver or boss of the group had "called McGraw and asked him if he was the rap partner of a guy named 'Muscles' (meaning McKnight) and there was something said concerning a rat. He said he was a rat. * * *." In response to questions McGraw identified himself as being the one who received only two years, whereas his partners in crime received much longer terms. In other words, the driver or boss of the group needlessly exposed McGraw to his co-workers in the field as a "squealer". Another witness, a trusty on the penal farm, testified that he heard the driver or boss say on that morning, "Which one of you men is the rap partner of 'Muscles'. McGraw said he was, and he (the driver or boss) asked him how much time did he get and he said two years, and Captain Dye said 'Didn't Muscles get 25 years', and he said, 'yes, sir.' He (the driver or boss) said, 'So you got 2 and he got 25?' And he said, 'He is the rat in the bunch.' Q. When he said that, do you know where Sorber was? A. Yes, sir, I was standing right by the side of him. Q. What did Sorber say? A. He said, 'There is one that ought to go down.' Q. Who was he talking about? A. Sonny McGraw." The appellant Sorber admitted, when testifying in his own behalf, that he made a similar statement to the above, but expressed regret that he had done so and denied knowing anything about McGraw's throat being cut until he saw him running back toward the water cart where he fell and died. The driver or boss above referred to as having exposed McGraw to the group as a squealer was discharged about three

days later, presumably when his action in the premises was disclosed during the investigation of the killing of McGraw, and he did not testify as a witness.

The first witness for the State during the trial on the merits was Andrew Warren, who was the driver of the water cart drawn by a mule for carrying water for the men to drink. He had stopped his cart on the turnrow, which was about 16 feet in width and ran north and south, then placed two buckets of water thereon about 50 feet ahead of the cart and returned to the same. While sitting on the water cart, and in plain view of the men due to the fact that the corn stalks were low, he claims to have seen McGraw, who had completed his row, go to the water bucket, where he drank a dipper of water; that he then saw McGraw turn south on the turnrow in the opposite direction from the water cart and being followed by the appellant Sorber and the said Wetzel, Jones and Harrison; that he saw Jones knock McGraw's hoe out of his hand, saw Sorber catch him by the hair, put his hand over the victim's mouth, and then saw Wetzel come up behind him, place one hand on his shoulder and then reach around him and cut his throat with a knife, which the witness saw clearly as Wetzel's hand went over McGraw's shoulder before he cut his said victim's throat; that thereupon he saw Wetzel hand the knife to the appellant Sorber, who evidently wrapped it in a blue handkerchief with white polka dots thereon, since he further testified that the knife was found at the edge of a drain ditch, a few feet from where the cutting occurred, and wrapped in a blue handkerchief, which was white polka-dotted, and covered with dirt; and another witness swore that he saw the appellant hide the knife there after he saw Wetzel hand it to him immediately after he had cut McGraw's throat with it. Any theory of suicide is wholly untenable, since the testimony of the physician who examined the victim was that the index and next two fingers on the left hand of McGraw had a clean knife-

cut thereon, in addition to saying his jugular vein was almost severed by a cut on the right side of his neck about two inches deep and three inches long. Then, too, McGraw was not shown to have had the knife, and could not have successfully disposed of one after his jugular vein had been almost severed.

There were a total of 25 witnesses who testified in the case, 19 of whom were convicts. Only 4 of them were eye-witnesses and able to directly implicate the appellant Sorber as one of the participants in the crime. Three of them testified that they saw him catch and hold McGraw by the hair while Wetzel cut his throat. And the other did not observe what was going on until he saw the victim going back toward the water cart with his throat cut, and about which time he saw Wetzel pass the knife to appellant Sorber and saw the latter wrap the blue handkerchief around it and bury it, where it was later found a few feet from where the cutting occurred. One or two witnesses testified to having seen Jones cross over to where Sorber was and confer with him just before the four accused men followed McGraw away from the water bucket. One witness testified that he saw ''Ohio'' Jones pouring water in Sorber's hands immediately following the killing. No blood was found on either the knife or the handkerchief in which it was wrapped and buried.

The sergeant at Camp 5 identified the handkerchief as being one of four such handkerchiefs which had been mailed to Sorber by his half-sister at Dayton, Ohio, two or three weeks prior to the killing of McGraw. It was the duty of this sergeant to check the contents of packages mailed to the convicts at this camp and he swore positively that there were four blue handkerchiefs that were white polka-dotted in the package in question; that after the knife and the handkerchief were found on the edge of the little ''dreene'' ditch a few feet from where the cutting occurred, a search of Sorber's locker at the camp was made and the other three

handkerchiefs were found therein, but the said half-sister of Sorber and his two daughters came from Dayton, Ohio, and testified that they were all familiar with the contents of the package sent him and that there were only three of the handkerchiefs thus described and another one of an indian design, which Sorber was wearing around his neck in the field on the day that McGraw was killed.

The defense introduced several convicts who testified to establish an alibi for Sorber, contending that he was not out on the turnrow where the cutting occurred but was near the witnesses who were nearing the end of the rows where they were planting the beans. Then Sorber testified in his own behalf that he was not in the group of men who killed McGraw and didn't know that anything unusual was occurring until he saw McGraw returning toward the water cart with his throat cut. He denied having held McGraw while Wetzel cut him or that he had received a knife from Wetzel or had wrapped one in a handkerchief and buried it.

Thus it will be seen that there was a direct conflict in the testimony as to whether or not the appellant Sorber had participated in the murder of McGraw, and there were some discrepancies in the versions of the state witnesses as to distances, how many men gathered on the turnrow, etc., but these conflicts were for the determination of the jury. None of the 70-odd convicts claimed that any other person or persons were guilty of the murder. If any of those who did not testify had knowledge in the premises they saw fit not to reveal what they knew. Nor is it contended that the defendant was entitled to an instruction directing the jury to acquit him. He does assign as error that the verdict is against the overwhelming weight of the evidence, but we do not think so. It is true that most of the witnesses were convicts, and that some of the eye-witnesses were men who seemed to have made crime a career, but when a brutal and ruthless murder of an accused prisoner

takes place in the presence of a group of other prisoners, the prosecution must of necessity rely upon the testimony of convicts or let the crime go unpunished. It is to be presumed that the jury in weighing the testimony of the witnesses took into consideration that they were convicts, in deciding which group of convicts who testified at all were telling the truth. Moreover, a number of the witnesses who testified to establish an alibi for the defendant made bold to say that if they had seen this crime committed and knew who had committed it they would not disclose the truth about the matter if and when called as witnesses.

It is clear from this record that it is the code of men who commit armed robbery, burglary, grand larceny, etc., that an accomplice who sees the error of his way, confesses his guilt, and discloses the truth to the law enforcement officers of the country, forfeits his right to live. Such a code of conduct should not be countenanced in a civilized country. This theory or philosophy is entirely at variance with the concepts entertained by all law abiding citizens. The witnesses who testified as to Sorber's participation in this crime had dared to do so after having witnessed what had happened to McGraw for doing the same thing, and the jury must have believed that the testimony of such witnesses was entitled to credence.

 █ From the foregoing views it follows that the verdict was not against the overwhelming weight of the evidence, that the motion for a new trial was properly overruled and that the defendant was not deprived of any constitutional right during the trial of the case on its merits. Nor do we find any prejudicial testimony in the record except such as was competent or unobjected to.

 █ This brings us to the final question of the case as to whether or not the trial court committed a reversible error in not granting a continuance of the case or in the alternative in not granting a change of venue.

Considering this assignment in reverse order, the appellant virtually concedes in his brief that a change of venue would have availed him nothing except to the extent that it might have continued the case for the time being. It is conceded that the publicity given the Wetzel case and the charges against the appellant, Jones, and Harrison by the articles appearing in the Memphis Commercial Appeal, Greenville Delta Democrat-Times, and the Jackson Daily News, had created the same alleged prejudgment in the public mind in the adjoining counties, the same as in Sunflower County where the case was tried, since the publicity was statewide. The precise contention of the appellant is that he was entitled to a continuance of the case instead of being required to go to trial immediately following the verdict and death sentence in the Wetzel case. But aside from the fact that this publicity would most likely have been revived at the time of the trial of the appellant some three or six months later in a nearby county, it is well settled in this state that the matter of granting a continuance is largely within the sound judicial discretion of the trial judge, and that his decision will not be disturbed in denying a continuance unless it appears that he has clearly abused his discretion in regard thereto.

Objections were made to the argument of the County prosecuting attorney, but no motion for a mistrial was made in regard thereto. Moreover, we do not think that the argument constituted reversible error; it is doubtful whether the jury could have accepted it as a logical conclusion from the facts contended for.

 The defendant offered no evidence in support of his motion for continuance other than the newspaper articles which were made exhibits thereto. On the other hand, the State introduced in support of its contention, that the defendant could then get a fair and impartial trial in Sunflower County, certain prominent citizens from various parts of the county consisting of the mayor of Indianola where the case was tried, the owner and

operator of a drug store there, the president of the board of supervisors, the mayor of the town of Moorhead and a druggist there, the mayor of the town of Inverness and a supervisor from District No. 4, farmers and business men at Ruleville and Drew in the northern end of the county, all of whom testified that in their opinion the case as against the appellant Sorber had not been prejudged. Naturally, the people of Sunflower County, as well as those in other counties of the state, would have thought whoever murdered McGraw should be punished; but neither the deceased nor his slayers were resident citizens of that county, except as inmates of the state penitentiary where they were separated from the general public, and where the material witnesses were likewise confined. Moreover, the homicide occurred on April 14, 1953 and this case was not tried until September 24th and 25th of that year. Section 2518, Code of 1942, provides that: "All indictments shall be tried at the first term, unless good cause be shown for a continuance." It was not shown to the satisfaction of the trial court that any different situation would have prevailed if the case had been continued until the next term of court, on the first Monday in March 1954. No proper showing for a change of venue was made in view of the fact that it is conceded that the newspapers in which most of the news items about the case had appeared, had a general circulation throughout the surrounding territory.

It is further contended that the continuance should have been granted for the reason that the regular veniremen of the week had been present in the courtroom during most of the trial of Wetzel. However, the record before us does not disclose a motion and order for a special venire, or whether if a special venire was summoned and empanelled the same did or did not consist of a sufficient number of men for obtaining the jury without resorting to the regular venire of the week for that purpose. In all probability a special venire was

summoned. But the record does not so disclose. Nor does it disclose whether or not any of the jurors who tried the case were on the regular venire of the week. Therefore, we don't know who the regular veniremen were.

The appellant was ably defended by an attorney, appointed by the court for that purpose, who has filed an excellent brief in his behalf on this appeal. We find no reversible error anywhere in the entire record. The case was properly submitted to the jury under correct instructions, about which no complaint is made on this appeal. After a careful consideration of the case by all nine of the judges, this Court is of the opinion that the judgment of conviction and sentence of the trial court should be affirmed.

Affirmed, and Thursday, January 20, 1955, is hereby fixed as the date for the execution of the death sentence in the manner provided for by law.

All nine of the judges concur.

## ON MOTION TO SET NEW EXECUTION DATE

January 7, 1957 91 So. 2d 747

KYLE, J.

The appellant, Minor Sorber, was convicted of the crime of murder in the Circuit Court of Sunflower County, Mississippi, and upon appeal to this court, the judgment of the trial court was affirmed on December 6, 1954, and the date of execution was fixed for January 20, 1955. Sorber v. State, Miss., 76 So. 2d 234. Appellant prosecuted an appeal to the Supreme Court of the United States, which Court, on May 31, 1955, dismissed the said appeal. 349 U. S. 948, 75 S. Ct. 877. Thereafter, appellant filed a petition in the Supreme Court of the United States for rehearing and on October 24, 1955, the Court denied the petition for rehearing. 350 U. S. 876, 76 S. Ct. 120.

The State then filed a motion for the setting of a new date for the execution of the appellant, and this Court on January 9, 1956, sustained said motion and set Thursday, February 9, 1956, as the date for the execution. Sorber v. State, Miss., 84 So. 2d 429. The appellant on February 3, 1956, filed a petition for a writ of habeas corpus, which was denied by the Honorable Arthur Jordan, Circuit Judge, and the action of the Circuit Judge in denying the petition for writ of habeas corpus was affirmed by this Court in Cause No. 40,184, on the 8th day of February, 1956. Sorber v. Wiggins, Supt., Miss., 85 So. 2d 479. The appellant thereafter prosecuted an appeal to the Supreme Court of the United States and secured a stay of execution pending the appeal. The Supreme Court of the United States on June 4, 1956, denied appellant's petition for writ of certiorari, as shown by a certified copy of an order of the Court filed with the Clerk of this Court. The appellant thereupon filed a petition for a rehearing which was denied by the Supreme Court of the United States on October 8, 1956, as shown by notice dated October 22, 1956, from the Clerk of the United States Supreme Court. The date of execution formerly set by this Court having passed, the State has filed another motion asking that a new date be set for the execution of the death sentence. Service has been made according to the rules.

The motion to set a new date for the execution of the death sentence upon the appellant is hereby sustained, and Friday, February 8, 1957, is fixed as the date for the execution of the death sentence in the manner provided by law.

Motion sustained and Friday, February 8, 1957, fixed as the date of execution of the death sentence.

All justices concur.

## ON MOTION TO SET NEW EXECUTION DATE

January 9, 1956 84 So. 2d 429

GILLESPIE, J.

The appellant was convicted of the crime of murder in the Circuit Court of Sunflower County, Mississippi, and upon appeal to this Court, the judgment of the trial court was affirmed on December 6, 1954, and the date of execution was fixed for January 20, 1955. Sorber v. State, 76 So. 2d 234. Appellant prosecuted an appeal to the Supreme Court of the United States, which Court, on May 31, 1955, dismissed the said appeal. Thereafter, appellant filed a petition in the Supreme Court of the United States for rehearing and on October 24, 1955, this Court denied the petition for rehearing.

The date for execution formerly set by this Court having passed, the State having filed its motion and supplemental motion to set a new date for execution of the death sentence upon the appellant, the said motions are hereby sustained and Thursday, February 9, 1956 is fixed for the date of the execution of the death sentence in the manner provided by law.

Motion sustained and Thursday, February 9, 1956 fixed as the date of execution of the death sentence.

All justices concur.